[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 30, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10629

_____

D. C. Docket No. 02-01683-CV-T-27-TBM

CRIS D'ANGELO,

Plaintiff-Appellant,

versus

CONAGRA FOODS, INC.,
d.b.a. Singleton Seafood Florida
Sea Meridian Products,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 30, 2005)

Before BLACK, MARCUS and FAY, Circuit Judges.

MARCUS, Circuit Judge:

Appellant Cris D'Angelo, who suffers from vertigo, sued her former

employer, ConAgra Foods, Inc., ("ConAgra") arguing that she was terminated from her job as a product transporter on the basis of a disability, in violation of Title I of the Americans with Disabilities Act (ADA). D'Angelo maintains that she is disabled under the ADA both because she suffers from an impairment -- her vertigo condition -- that substantially limits her ability to perform the major life function of working, and because her employer regarded her as suffering from such an impairment.

The district court granted summary judgment for ConAgra on both issues. We now affirm as to the former, since D'Angelo's vertigo prevents her only from holding a narrow category of jobs and thus does not substantially impair her ability to work. We reverse, however, as to D'Angelo's claim that she was regarded as having such an impairment. There are genuine issues of material fact concerning whether ConAgra regarded D'Angelo as disabled and whether she was able to perform the essential functions of her job in spite of her vertigo condition. Moreover, we conclude that the ADA, by its plain language, requires employers to provide reasonable accommodations for employees they regard as disabled. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

The essential facts are these. Cris D'Angelo began working for ConAgra, in its Singleton Seafood ("Singleton") processing plant, in October 1998. She was hired as a "spreader" -- an entry-level position requiring her to stand at a moving conveyor belt (called the "spreader belt") and spread shrimp with her fingers to prevent it from sticking together. She also worked at times as a "packer," packing shrimp into boxes. D'Angelo was promoted twice during her tenure at Singleton. First, in February 1999, she was promoted to the position of "stacker," which required her to take sealed boxes off of a machine and stack them onto a pallet for a forklift operator. D'Angelo was then promoted to the position of "transporter" or "product transporter" in March 2000. As a transporter, she filled boxes with shrimp and transported them around the plant using a pallet jack or by hand. In addition, she performed various other tasks including forming, packing, and stacking boxes.

D'Angelo was initially employed in Singleton's "shrimp division," until she was transferred to the "fish division" around June 2000, where she continued to work as a transporter. Upon transferring to the fish division, D'Angelo told her supervisor that she was a product transporter and explained: "I can do anything except work over the spreader because when I stand there staring at it for any period of time, I start getting sick and dizzy." As a transporter in the fish division,

D'Angelo stacked; pulled pallets with a jack; packed; worked in an area above the plant floor called "the triangle" making sure that fish traveling down a chute did not clog the machines; weighed product; and "once or twice" worked on the box-former machine and the saw.

Generally, when D'Angelo came to work she was assigned a particular duty, which she performed throughout her entire shift. On occasion, however, she and other employees were asked to assist with other duties. The employee known as the "line leader" assigned the particular job that an employee was required to perform. The available jobs in the fish division included stacker, product transporter, saw operator, stein operator, checker, forklift driver, area specialist, line leader, machine operator, packer, and spreader. Each job was classified at a particular level between I and V -- product transporter, for example, was Level III -- and employees were considered qualified to work in any position at or below the level of their own job.

In September 1998, shortly before she began working at Singleton, D'Angelo was diagnosed with vertigo. She awoke one morning and, she explained, "everything was spinning, . . . I couldn't even lift my head up. I got up and tried to . . . walk, and I was throwing up." She was treated by a doctor, who prescribed the anti-vertigo medication Antivert, a prescription D'Angelo says she

4

did not fill because she started to feel better.

D'Angelo did not mention her condition when she was hired at Singleton. Several months into her job, however, D'Angelo experienced episodes of vertigo at work, and informed her co-workers and supervisor that working over the spreader belt was making her feel sick and dizzy. At times, D'Angelo explained that she suffered from vertigo, and other times she told people only that the work made her dizzy and sick. D'Angelo only became sick working on the spreader belt when she had "to stare at that moving belt." She explained: "If it's a belt where you're not staring at it continuously, you're looking away sometimes, . . . that's not a problem. Or if it's moving near me but I'm not monitoring it, that's not a problem." The only problem for her was when she had to stare at the belt "[c]ontinuously without a break."

D'Angelo's vertigo condition resurfaced in September 2001 -- a year and a half into her tenure as a product transporter -- when a new supervisor, Hipolito Mendoza, assigned her to monitor a conveyor belt known as the "box-former belt." This job, as D'Angelo described it, entailed "watching the boxes go . . . in a line" to make sure they were formed properly and not mangled. This was a task that D'Angelo had never previously performed, and doing it, she explained:

> I start[ed] feeling like I have a fever, and I start[ed] feeling sort of
> light-headed and off balance and nauseous. . . . I wanted to try to

5

make it work, but I felt myself getting sick, and I thought, "It's not worth it." And I would try to look away, you know. If I can stand over one of these belts and be looking away a lot, its okay, but to stare continuously at it is what gets me sick. And the nature of the boxes coming down the line, you have to stare continuously because if you don't you might miss one.

D'Angelo told her line leader, Darlene, that monitoring the box-former belt was making her sick and dizzy, and asked for a different work assignment. Darlene told D'Angelo to go make boxes, which D'Angelo did until Mendoza instructed her to return to the conveyor belt. D'Angelo explained that the conveyor belt made her sick, and Mendoza asked for "documentation" of her condition.

Approximately a week later, D'Angelo gave Mendoza a copy of her prescription for Antivert. Then, on September 20, 2001, she gave Thomas Cordy, the plant manager, a note from Dr. Arthur E. Heng, which stated:

> This patient should not work more than 5 nights a week because of her medical condition. Also, she has a vertigo condition. This affects her when her eyes have to look at moving objects such as belts. She should avoid this situation since it could cause her to fall and sustain injury.

D'Angelo explained in her deposition that the restriction on the number of days she could work was unrelated to her vertigo condition, but rather was a result of a bout with hepatitis and a prolonged case of the flu.

After receiving the doctor's note, Cordy met with Singleton's Vice President

6

of Human Resources, Mark Richard Yates, to discuss whether there were any available positions that would not require D'Angelo to look at and work around moving equipment such as conveyor belts. They determined that no such positions were available.

The next day, D'Angelo was terminated. Cordy gave her a letter of termination, dated September 21, 2001, stating:

> Your note from Doctor Heng, presented to me on September 20, 2001, was the first either the Human Resources Department or I was made aware of your medical condition.
>
> We have evaluated your position as it relates to the restrictions that Doctor Heng has placed upon you. Unfortunately, your position as a product transporter requires you to work around moving conveyors and mechanized equipment. This is an integral portion of the position. Additionally, overtime is a requirement requiring work for more than five (5) nights per week; this too is an integral part of the job.
>
> Based upon the restrictions that have been placed upon you by your physician, we are unable to allow you to continue to work at Singleton Seafood because you pose a safety hazard to yourself and your co-workers.

After her discharge, D'Angelo filed a union grievance, alleging unjust termination. She never received a response.[1]

---

[1] D'Angelo also continued to be treated by Dr. Heng, who wrote her a second note in January 2002, stating:

> This person should not work more than 5 nights a week because of her medical condition. Patient is able to work around mechanized equipment, but is unable to work at a conveyor belt for a long period of time due to vertigo, because it could

D'Angelo filed suit against ConAgra in the United States District Court for the Middle District of Florida on September 16, 2002.  D'Angelo alleged that terminating her -- rather than reasonably accommodating her by exempting her from working on the spreader belt and the box-former belt -- constituted disability-based discrimination, both because she was actually disabled as a result of her vertigo condition and because her employer regarded her as disabled, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., and parallel provisions of the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq.[2]  Soon thereafter, ConAgra moved for summary judgment, arguing that D'Angelo was neither disabled nor regarded as disabled within the meaning of the ADA, and that she was not a "qualified individual" since she was unable to perform the essential functions of her job.

The district court granted summary judgment for ConAgra.  As to D'Angelo's argument that she was actually disabled, the court found that she was not, since her vertigo condition did not significantly limit her in the major life

_____

cause her to fall and sustain an injury.

D'Angelo's vertigo condition persisted, and she began taking the medication Meclizine to treat it.

[2]The district court correctly observed that disability-discrimination claims under the Florida Civil Rights Act are analyzed under the same framework as ADA claims, see Chanda v. Englehard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000), and considered both sets of claims together.

8

activity of working. As to D'Angelo's argument that she was "regarded as" disabled by ConAgra, the district court determined (1) that there existed a genuine issue of material fact concerning whether ConAgra regarded her as disabled, but (2) someone who is merely "regarded as" disabled (as opposed to actually disabled) is not entitled to a reasonable accommodation under the ADA, and (3) even if regarded-as plaintiffs were entitled to such accommodation, D'Angelo was not a "qualified individual" anyway, since even with an accommodation, she could not perform the essential job functions of a product transporter, one of which is working on a conveyor belt.

It is from this order of final summary judgment that D'Angelo now appeals.

II.

D'Angelo makes three general arguments on appeal. First, she contends that the district court improperly concluded she was not actually disabled, since her vertigo condition is an impairment that substantially limits her ability to perform the major life function of working. Second, she claims that the district court erred in determining that the ADA does not require employers to make reasonable accommodations for individuals regarded as disabled. Finally, D'Angelo says that the district court incorrectly found that she was not a qualified individual able to perform her essential job functions, since there is a genuine issue of material fact

9

as to whether working on a conveyor belt is an essential function of the product transporter position.

We review the district court's grant of summary judgment de novo, viewing the materials presented and drawing all factual inferences in a light most favorable to the non-moving party.  Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005).  Summary judgment is properly granted when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The movant bears the burden of demonstrating the satisfaction of this standard, by presenting 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that establish the absence of any genuine, material factual dispute."  Bochese, 405 F.3d at 975 (quoting Fed. R. Civ. P. 56(c)).

## A.

We begin our review of D'Angelo's claims with an overview of the relevant provisions of the Americans with Disabilities Act.  The ADA's general prohibition on disability-based discrimination unambiguously says:

> No covered entity shall discriminate against a qualified individual
> with a disability because of the disability of such individual in regard
> to job application procedures, the hiring, advancement, or discharge of
> employees, employee compensation, job training, and other terms,
> conditions, and privileges of employment.

10

42 U.S.C. § 12112(a).

The ADA proceeds to identify three types of "disability" that place an individual within the statute's protections:

The term "disability" means, with respect to an individual--

(A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)   a record of such an impairment; or

(C)   being regarded as having such an impairment.

Id. § 12102(2).

The statute protects, however, only qualified individuals with disabilities, who are defined this way:

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

Id. § 12111(8); see also, e.g., Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).

An employer's failure to make reasonable accommodation for an otherwise qualified disabled employee constitutes discrimination under the ADA, which states, in pertinent part:

The term "discriminate" includes--
. . . .

11

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . .

42 U.S.C. § 12112(b); see also Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) ("An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability -- unless doing so would impose undue hardship on the employer.").

Thus, to establish a prima facie case of employment discrimination under the ADA, a plaintiff must demonstrate "that (1) he has a disability, (2) he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." Reed v. The Heil Co., 206 F.3d 1055, 1061 (11th Cir. 2000); see also, e.g., Lucas, 257 F.3d at 1255.

B.

D'Angelo first argued in district court that she had a "disability" both in the sense defined in § 12102(2)(A) -- an actual physical impairment substantially limiting her in a major life activity -- and in the sense defined in § 12102(2)(C) -- "being regarded as having such an impairment." (We will refer to D'Angelo's §

12

12102(2)(A) claim as her "actual-impairment" claim, and to her § 12102(2)(C) claim as her "regarded-as" claim.)[3]

D'Angelo's actual-impairment claim is simply that her vertigo condition constituted an impairment that substantially limited her ability to perform the major life activity of working. She explained:

> It's not possible to function normally during a vertigo attack. For Appellant such episodes have been as short as several seconds and as long as several weeks. Medication for vertigo has sometimes stopped the symptoms and sometimes has not. Some medication administered for vertigo has been as disabling as the vertigo itself.

Reply Br. at 1.

The district court correctly concluded that D'Angelo's vertigo does not qualify as an actual-impairment disability under the ADA, since it does not "substantially limit[] one or more of the major life activities" of D'Angelo. 42 U.S.C. § 12102(2)(A). D'Angelo says that her vertigo condition substantially

---

[3]As an initial matter, ConAgra argues that D'Angelo abandoned her actual-impairment claim on appeal, since she did not clearly assert it in her opening brief. Although the primary focus of D'Angelo's initial brief is undoubtedly her regarded-as claim, we find her actual-impairment claim adequately -- albeit inartfully -- raised on appeal. D'Angelo asserts at least twice in her initial brief that she suffered from a disability, which was the basis for her firing. See Br. at 12 ("The record evidence was sufficient to lead a reasonable jury to conclude that APPELLANT'S physical disability was the likely motivational factor in APPELLANT'S termination."); Br. at 27 ("[A] reasonable jury could easily infer that APPELLANT'S disability was a factor in the termination of APPELLANT . . . ."). Moreover, in response to ConAgra's abandonment argument, D'Angelo, in her reply brief, clarifies that she did not intend to waive this claim. D'Angelo filed her appellate briefs pro se, and we think it appropriate, in this case, to address her actual-impairment claim, particularly since we have little trouble concluding that it fails on the merits.

13

impairs her ability to work, which we have consistently treated as a major life activity. See, e.g., Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1216 & n.2 (11th Cir. 2004).[4] The problem is that she has not shown a genuine issue of material fact as to whether her vertigo substantially limits her ability to work.

The Supreme Court has explained that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). Indeed, the Equal Employment Opportunity Commission (EEOC) regulations interpreting the ADA make it abundantly clear that an individual's ability to work is "substantially limited" when the individual is "significantly restricted in the ability to perform either a class of jobs or a broad

---

[4]As we noted recently in Carruthers:

The Supreme Court more recently has expressed its reluctance to treat impairment of one's ability to work as an ADA disability. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 200, 122 S. Ct. 681, 692, 151 L. Ed. 2d 615 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."). Previously, however, this circuit has, following the ADA regulations and Sutton's [below]-quoted language, treated the activity of working as a major life activity. See, e.g., Cash v. Smith, 231 F.3d 1301, 1306 ([11th Cir. ]2000); Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 911-12 (11th Cir. 1996). In the absence of a more explicit directive from the Supreme Court, we do not revisit that conclusion here.

Carruthers, 357 F.3d at 1216 n.2.

14

range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

D'Angelo has argued, however, only that her vertigo interferes with her ability to work as a product transporter at Singleton's seafood plant, not that she is restricted in her ability to perform "a class of jobs" or "a broad range of jobs in various classes." Moreover, as the district court observed:

> [D'Angelo] performed satisfactorily while employed with Defendant for three years. Her performance as a spreader and stacker earned her two promotions. The fact that she never felt the need to take medication which was prescribed to control or minimize her vertigo symptoms indicates that she managed her vertigo symptoms adequately. Additionally, while she occasionally experienced diziness at work, during the entire period of time she worked at Singleton, she never experienced "full-blown vertigo where things were spinning around in circles." Plaintiff's proven ability to work contradicts any contention that she was substantially limited in the major life activity of working.

Order at 8-9 (citations omitted).

In addition, D'Angelo herself has argued -- in the context of her regarded-as claim -- that Singleton's belief she was disabled was mistaken. See, e.g., Opposition to Summary Judgment Motion, at 13 ("Defendant mistakenly believed that Plaintiff had a substantially limiting impairment, when in fact she did not.").

15

We therefore affirm the district court's grant of summary judgment for ConAgra on D'Angelo's <u>actual-impairment</u> claim.

C.

We turn next to D'Angelo's argument that she has a disability within the meaning of § 12102(2)(C) -- "being regarded as having such an impairment."  The EEOC regulations interpreting the ADA have explained that to be "regarded as having such an impairment" means that an individual:

(1)    Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2)    Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3)    Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).  D'Angelo argues that she qualifies under the first category: she has a physical impairment -- her vertigo condition -- that does not substantially limit her in the major life activity of working, but that was treated by her employer as though it did constitute such a limitation.

The Supreme Court has explained that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the

16

person's actual, nonlimiting impairment substantially limits one or more major life activities." Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22, 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999); see also Hillburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1230 (11th Cir. 1999) ("As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual."). Thus, "[a]n employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." Sutton, 527 U.S. at 490.

The district court found a genuine issue of material fact as to whether Singleton regarded D'Angelo as disabled,[5] but nevertheless determined that

---

[5] ConAgra argues in its brief that it did not in fact regard D'Angelo as disabled. Because the district court entered judgment entirely in ConAgra's favor in spite of finding a genuine issue of material fact on this issue, ConAgra had no basis for a cross-appeal. See, e.g., RTC Transp., Inc. v. Conagra Poultry Co., 971 F.2d 368, 374 (9th Cir. 1992) ("A party cannot appeal a judgment entirely in its favor. It may, however, advance additional arguments in support of the judgment in its answering brief."); Byron v. Clay, 867 F.2d 1049, 1051 (7th Cir. 1989) ("A cross-appeal is an appeal, and is therefore in order only when a party wants to change (even if only conditionally) the trial court's judgment."). However, ConAgra is free to raise this argument as an additional ground for affirming the district court's judgment in its favor, since we may affirm the district court's judgment "on any ground that finds support in the record." Lucas, 257 F.3d at 1256 (quoting Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 1 L. Ed. 2d 314 (1957)); see also, e.g., Trs. of Atlanta Iron Workers v. S. Stress Wire Corp., 724 F.2d 1458, 1459 (11th Cir. 1983) ("Absent a cross-appeal, an appellee may not attempt to enlarge his own rights or decrease the rights of his adversary; however, he may advance a matter in the record which is in support of the district court's order, including arguments previously rejected by the district court.").

Nevertheless, we agree with the district court that D'Angelo has presented sufficient evidence to create a genuine issue of material fact as to whether she was regarded by her

17

<u>D'Angelo was not entitled to a reasonable accommodation for two reasons: first,</u>

employer as disabled.  D'Angelo claims only to be limited in her ability to work directly on a conveyor belt for prolonged periods of time, but Cordy and Yates both testified that they regarded D'Angelo's impairment as substantially more limiting.  Cordy stated that he read Dr. Heng's note explaining D'Angelo's condition to mean that D'Angelo "can't be around moving equipment because she has vertigo and may fall and hurt herself."  Cordy then reiterated that he "knew [D'Angelo's condition] was going to be a problem," because Dr. Heng's letter "said she had vertigo and that she shouldn't be around moving equipment."  When asked whether it was his understanding that if D'Angelo "just happened to be in the same room as a moving belt she might get dizzy and fall," Cordy replied in the affirmative.  He also clarified that he believed this limitation to apply not only to conveyor belts, but to "all moving equipment."

In addition, Cordy testified that he believed D'Angelo's condition would prevent her from holding any of the eleven night-shift jobs at Singleton, "[b]ecause [in] every one of those positions there's moving equipment."  He also stated that he believed D'Angelo was unable to work in any position in the fish division, which, he agreed, had "a wide range of jobs."  At Yates' request, Cordy considered "each of the positions" at Singleton, and concluded that he "didn't think it was possible for [D'Angelo] to work safely in the plant."

Yates also testified that Dr. Heng's note "said something to the effect that Ms. D'Angelo could not work around moving equipment because she could get dizzy and injure herself."  Thus, he explained, "Mr. Cordy and I reviewed the jobs that we have.  Every job involves working around moving equipment."  Yates interpreted moving equipment, he stated, "to mean conveyors, forklifts, could even be pallet jacks, could be anything."

This case thus stands in sharp contrast with the Supreme Court's decision in <u>Murphy</u>, in which it found no genuine issue of material fact as to whether the plaintiff's employer regarded him as disabled.  The Court explained:

> [I]n light of petitioner's skills and the array of jobs available to petitioner utilizing those skills, petitioner has failed to show that he is regarded as unable to perform a class of jobs.  Rather, the undisputed record evidence demonstrates that petitioner is, at most, regarded as unable to perform only a particular job.  This is insufficient, as a matter of law, to prove that petitioner is regarded as substantially limited in the major life activity of working.

<u>Murphy</u>, 527 U.S. at 525.

D'Angelo, however, was regarded as unable to perform any job that would place her in the vicinity of any moving equipment, and thus her employer could not find a single job in the Singleton plant that it believed she could perform.  Such a far-reaching impairment -- which would disqualify her from the entire class of factory jobs, and from many others -- would substantially limit D'Angelo's ability to work.  Thus, the district court rightly found a genuine issue of material fact as to whether D'Angelo was regarded as disabled.

18

because she was not a "qualified individual"; and second, because the ADA mandates accommodations only for employees who are disabled in the actual-impairment sense. We consider each in turn.

1.

The ADA prohibits employment discrimination against a "qualified individual with a disability," defined as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Accordingly, an ADA plaintiff "must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." Davis, 205 F.3d at 1305. If the individual "is unable to perform an essential function of his . . . job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA. In other words, the ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." Id. (citation omitted).

The district court found as a matter of law that D'Angelo was not a qualified individual since working on a conveyor belt was an essential function of her product transporter position, which she was unable to perform even with a

19

reasonable accommodation. After thoroughly reviewing this record, we disagree, and conclude that there is a genuine issue of material fact as to whether working on a conveyor belt was an <u>essential function</u> of the product transporter job.

The ADA's implementing regulations provide that "[t]he term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires," and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." <u>Davis</u>, 205 F.3d at 1305. In making this determination, the statute provides, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); see also <u>Holbrook v. City of Alpharetta</u>, 112 F.3d 1522, 1526 (11th Cir. 1997). "The ADA regulations provide that other factors to consider are: (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs." <u>Davis</u>, 205 F.3d at

20

1305 (citing 29 C.F.R. § 1630.2(n)(3)).

These regulations also identify three (nonexclusive) bases on which a job function may be deemed essential: "(1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function." Holbrook, 112 F.3d at 1526 (citing 29 C.F.R. § 1630.2(n)(2) (1996)).

Notably, the first enumerated factor -- the employer's assessment -- at least arguably suggests that working on a conveyor belt is not an essential function of the product transporter job. To begin with, the testimony of D'Angelo's supervisors at Singleton is at best inconclusive on this point.

Mark Richard Yates, Singleton's Vice President of Human Resources, and Thomas Michael Cordy, the plant manager at Singleton, both testified about the nature of the product transporter position without mentioning conveyor belt work as an essential function of that job. Yates, in response to the question, "What are the essential functions of [the product transporter] position?" stated:

> One of the essential functions would be able to move product from one end of the line to another in and out of freezers, stacking pallets, be working around moving equipment. Pretty much -- I think that's pretty much it.

21

Cordy explained the essence of the job in these terms:

> Product transporter in the strictest sense operates an electric pallet jack or a hand jack to move product. And in the fish division it also meant they could be a case opener, opening cases at the beginning of the fry line or working the block press.

Cordy also listed a number of other functions a product transporter might be asked to perform, including operating the box-former machine, stacking product, opening bags, and "dump[ing] product on conveyor belts."

Joanne Scott Brister, D'Angelo's supervisor in the shrimp division, unambiguously said that as a product transporter, D'Angelo "wouldn't work on a conveyor belt." Her exchange with D'Angelo's counsel went as follows:

> Q. Would you say that as a product transporter [D'Angelo] would rarely work on a conveyor belt?
>
> A. Right, yes.
>
> Q. Maybe not at all?
>
> A. No, she wouldn't work on a conveyor belt.

Brister further clarified that the position of product transporter "does not require you to work on a belt." The exchange with D'Angelo's counsel went like this:

> Q. So as a product transporter for the fish division Miss D'Angelo wouldn't be working on conveyor belts for any significant period of time, correct?
>
> [Objection by defense counsel.]

22

A. No.

Q. Okay. In fact, that wouldn't even be one of her requirements as a product transporter, correct?

[Objection by defense counsel.]

A. Correct.

Q. Okay. So when you're looking at the functions of the job for product transporter it does not include working on a conveyor belt, correct?

[Objection by defense counsel.]

A. No, it does not require you to work on a belt.

Moreover, Singleton's written descriptions of the position -- which we are statutorily bound to consider as evidence of whether a job function is essential -- also suggest that working on a conveyor belt may not be an essential function of the product transporter position. At her deposition, D'Angelo introduced, among other exhibits, a handwritten note copying into a notebook a written job description of the product transporter position that she had seen posted on a company bulletin board. The note reads:

"Product Transporter"
1. Must Be Able to operate handjack/power jack
2. English
3. Must be able to lift 50 lbs
Duties:
transport product from dept to freezers
misc.

23

Nothing in this description even mentions working on a conveyor belt, let alone characterizes it as an essential function of the product transporter job.

In addition, D'Angelo introduced into the summary judgment record a document entitled, "Job Safety Analysis" for the product transporter position, which D'Angelo and her supervisor signed and dated May 9, 2001. The document lists various functions of the transporter job, the safety hazards they pose, and methods of avoiding these hazards. The job functions listed are these:

> Working in production areas
> Working in wet slippery conditions
> Work in freezers
> Operate powered stacker
> Working around running equipment
> Remove empty pallets from line
> Shrink wrap full pallets
> Transport pallets to ACS
> Working in warehouse
> Work near ammonia & nitrogen refrigerant
> Work around hot oil, thermal fluid

Again, this document in no way indicates that working on a conveyor belt is an essential function of the product transporter job. No other written job description was ever offered by the employer. Thus, application of the first factor in our analysis -- the employer's own assessment -- suggests the existence of a genuine issue of material fact about whether conveyor belt work was an essential function of the product transporter job.

The next factor -- the amount of time D'Angelo spent working on a conveyor belt during her tenure as a product transporter -- further raises a genuine issue of material fact. D'Angelo's description of her experience working as a product transporter indicates that working on a conveyor belt was at most an occasional function of her job. Regarding her duties as a product transporter in the shrimp division, D'Angelo stated:

> According to the [product transporter] job description, you transport product using a pallet jack. And so what I did a lot was stand near a chute where the shrimp comes out when the machine gets messed up, and the shrimp is coming out backwards and it falls into a box. And when the box is filled up, I move another box under there and fill that one up.
>
> And then those boxes would get stacked on a pallet by me, and I would either pull them away with a jack or a forklift driver would get in there and pull them away.

D'Angelo acknowledged that, in addition to this primary function, she sometimes performed other tasks including transporting boxes of shrimp on her shoulders; working as a stacker; working as a packer; and making boxes.

When D'Angelo transferred to Singleton's fish division, she continued to work as a product transporter. After her transfer, her new supervisor asked her, "What do you do over there? What can you do?" to which she replied, "Well, I'm a product transporter. I can do anything except work over the spreader belt because when I stand there staring at it for any period of time, I start getting sick

25

and dizzy." Her supervisor said, "Okay," and asked her, "Can you go up in the triangle? Are you afraid of heights?" to which D'Angelo replied, "No, I've got no problem with that."

D'Angelo testified that her responsibilities as a transporter in the fish division differed from those of her transporter position in the shrimp division. She said: "[I]t wasn't the same as the shrimp department where the machines would back up and dump out shrimp and need somebody monitoring that constantly. So there wasn't the need for the same type of work. The machines were functioning better in the fish department." D'Angelo described her typical responsibilities in the fish department in these terms: "[M]y title was product transporter. Sometimes I stacked. Sometimes I pulled the pallets away with a jack. Sometimes I packed. Sometimes I went up in the triangle . . . when the fish was coming down, just kind of [to] make sure it doesn't clog up the machine." On occasion, D'Angelo also weighed product, unloaded boxes of fish, and dumped fish into a grinder.

Indeed, the record before us reveals only <u>one</u> time during the year and a half D'Angelo worked as a product transporter that she was assigned to work on a conveyor belt. D'Angelo was promoted to the transporter position in March 2000, and was apparently not asked to work on a conveyor belt until shortly before she was fired some eighteen months later in September 2001, when a new supervisor

took over in the fish division.  D'Angelo's deposition testimony mentions no other instance in which she was asked to work on a belt, and ConAgra has offered no evidence to the contrary.  In the absence of any indication that D'Angelo worked on a conveyor belt more than once during her product transporter tenure, the second factor in our analysis -- the amount of time D'Angelo spent performing that function -- also arguably weighs against finding it to be essential as a matter of law.

The third factor in our analysis -- the consequences of not requiring the employee to perform the disputed function -- cuts both ways.  ConAgra says that the consequences of exempting D'Angelo from conveyor belt work would be serious, since maintaining the flexibility to move employees around the factory floor to perform different functions tasks is vital to the efficient operation of the plant.  Both Cordy and Yates testified that Singleton employees are "regularly" moved around in this fashion.  While the employer's view is entitled to substantial weight in the calculus, on this record we are not persuaded that this factor conclusively tips the balance in favor of final summary judgment.

For one thing, all Singleton employees are qualified to work on a conveyor belt.  It is not a specialized function, and indeed, D'Angelo testified that all employees are required to start at the entry-level position of spreader, working over

27

the spreader belt separating product. Since employees are eligible to work in any job at or below the level of their primary position, all can work on a conveyor belt. Thus, virtually any employee in the plant apparently could fill in on the belt as needed, minimizing any consequences of D'Angelo's inability to work on the belt.

In addition, while D'Angelo's testimony confirms that she performed a variety of different tasks with regularity as product transporter, working on a conveyor belt was not one of them. She held the product transporter position from March 2000 until September 2001 without ever being asked to work on the conveyor belt, suggesting that her difficulty working on a conveyor belt may have been of little, if any, consequence to her employer.

The remaining factors in our essential-function analysis are inapplicable here. The collective bargaining agreement says nothing about the functions of the product transporter position, and the record contains no evidence regarding the work experience of either past product transporters (other than D'Angelo) or incumbents in similar jobs. Moreover, none of the circumstances we have previously identified as bases on which a job function may be deemed essential -- circumstances the district court did not acknowledge -- is found here. The federal regulations implementing the ADA establish -- and our case law affirms -- that "[a] job function may be considered essential for any of several reasons, including but

not limited to the following": (1) "the reason the position exists is to perform that function"; (2) there are a "limited number of employees available among whom the performance of that job function can be distributed"; or (3) the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2); see also, e.g., Holbrook, 112 F.3d at 1526.

As to the first possibility, it is undisputed that the position of product transporter does not exist to perform the function of working on a conveyor belt. The job description and the testimony of Cordy, Yates, and D'Angelo suggest that the primary function of the product transporter position is to move product around the plant using a jack. On this record, working on the conveyor belt at least arguably appears to be no more than a secondary responsibility.

As to the second possibility, the record reveals no shortage of employees among whom conveyor belt work could be distributed. According to Cordy's testimony, approximately 300 people work in the Singleton plant, including 19 to 20 on the night shift in the fish division -- the shift D'Angelo worked at the time she was fired. All Singleton employees are required to start in the spreader position, and thus all of these individuals are qualified to work on the conveyor belt. As to the third possibility, working on the conveyor belt is not a specialized

29

function, but rather entry-level work requiring no particular expertise. As D'Angelo testified, all Singleton employees start on the spreader belt and may bid on other jobs only after acquiring some seniority at the plant.

Thus, applying the factors we have previously identified does not point decisively to the conclusion that, <u>as a matter of law</u>, working on the conveyor belt is an essential function of the product transporter position. While this may truly be an essential function -- and the employer's judgment on the matter is entitled to substantial weight -- on this record we see a genuine issue of material fact, and accordingly reverse the district court's grant of final summary judgment for ConAgra on this question.[6]

---

[6]ConAgra also seems to argue more broadly that D'Angelo is not a qualified individual because she is unable to perform the undisputedly essential job function of working <u>around</u> moving equipment such as conveyor belts. ConAgra takes Dr. Heng's note -- which says that D'Angelo's vertigo "affects her when her eyes have to look at moving objects such as belts," and thus "[s]he should avoid this situation since it could cause her to fall and sustain injury" -- to mean that D'Angelo cannot work even in the vicinity of moving objects. Because there are undoubtedly many such objects on the floor of the Singleton plant, ConAgra argues, D'Angelo is unqualified to work there as a product transporter.

However, even under ConAgra's broader formulation of the function at issue in this case, summary judgment is inappropriate on this point, since substantial record evidence indicates that D'Angelo could work <u>around</u> moving equipment, and was limited only in her ability to work directly <u>on</u> a conveyor belt.

D'Angelo testified that her only difficulty was with tasks that required her to stare directly at a conveyor belt for prolonged periods; accordingly, the only accommodation she sought from ConAgra was an exemption from working on the spreader belt (separating shrimp as they travel down the line) and on the box-former belt (watching boxes travel down the line to see if they are properly formed). As D'Angelo explained in her deposition, she only became sick when she had to stare at a conveyor belt "[c]ontinuously without a break," and that "[i]f it's a belt where you're not staring at it continuously, you're looking away sometimes, . . . that's not a

2.

In disposing of D'Angelo's claim that she was "regarded as" disabled, the district court held also that an individual like D'Angelo, who does not actually suffer from a disabling impairment, but rather is disabled only in the "regarded as" sense, is not entitled to a reasonable accommodation under the ADA. Thus, the district court reasoned, because D'Angelo could not perform her job as a transporter at Singleton without an accommodation -- namely, an exemption from working on the spreader and box-former belts -- she had no claim under the ADA.

Whether the ADA's reasonable accommodation requirement applies to the regarded-as category of disabled individuals is an issue of first impression in this Circuit and a question on which our sister Circuits are split. The district court based its holding that it does not on the decisions of the Fifth, Sixth, Eighth, and Ninth Circuits. See Kaplan v. N. Las Vegas, 323 F.3d 1226, 1233 (9th Cir. 2003); Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999); Workman v. Frito-

_____

problem. Or if it's moving near me but I'm not monitoring it, that's not a problem."

Dr. Heng, in a note written in January 2002, also confirmed that D'Angelo "is able to work around mechanized equipment, but is unable to work at a conveyor belt for a long period of time due to vertigo" (emphasis added). Indeed, it is undisputed that in spite of the fact that the factory floor was an elaborate maze of conveyor belts and other mechanized equipment, D'Angelo was able to perform her work satisfactorily during three years of employment at Singleton, and even received two promotions.

D'Angelo's own testimony and her prior job performance at Singleton create a genuine issue of material fact as to whether D'Angelo was able to perform the essential function of working around moving equipment, rendering summary judgment inappropriate on this point.

Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999); Newberry v. E. Tex. State Univ., 161 F.3d 276, 280 (5th Cir. 1998).  The Third Circuit has parted ways with these courts, holding that under the plain language of the ADA, employers are obliged to provide reasonable accommodations for individuals falling within any of the ADA's definitions of disabled, including those "regarded as" being disabled. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 772-76 (3d Cir. 2004). The First Circuit has also addressed the issue but only indirectly, assuming without expressly holding that the ADA requires reasonable accommodations for employees regarded as disabled.  Katz v. City Metal Co., 87 F.3d 26, 32-34 (1st Cir. 1996).

Because a review of the plain language of the ADA yields no statutory basis for distinguishing among individuals who are disabled in the actual-impairment sense and those who are disabled only in the regarded-as sense, we join the Third Circuit in holding that regarded-as disabled individuals also are entitled to reasonable accommodations under the ADA.

In interpreting a statute, it is by now axiomatic that our first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997); see also, e.g., Country

32

Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004). We therefore turn to the text.

Again, the ADA bars employment discrimination "against a qualified individual with a disability" on the basis of such disability. 42 U.S.C. § 12112(a). A "qualified individual with a disability" "means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). Accordingly, reading the prohibition and the definition together, the ADA bars discrimination "against an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ."

A "disability," in turn, is defined by the statute as either "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," or "a record of such an impairment," or "being regarded as having such an impairment." Id. § 12102(2)(A)-(C) (emphasis added). Inserting this definition into the statute's prohibition, the ADA can only be read as barring discrimination "against an individual with a physical or mental impairment that substantially limits one or more major life activities of such individual who, with or without reasonable accommodation, can perform the essential functions of the

33

employment position," and as barring discrimination "against an individual with a record of such an impairment who, with or without reasonable accommodation, can perform the essential functions of the employment position," and, finally, as barring discrimination "against an individual regarded as having such an impairment who, with or without reasonable accommodation, can perform the essential functions of the employment position." In other words, the statute's prohibition on discrimination applies equally to all statutorily defined disabilities.

Moreover, "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Id. § 12112(b). The ADA prohibits discrimination "against a qualified individual with a disability." Accordingly, the statute plainly prohibits "not making reasonable accommodations" for any qualified individual with a disability, including one who is disabled in the regarded-as sense no less than one who is disabled in the actual-impairment or the record-of-such-an-impairment sense.

The text of this statute simply offers no basis for differentiating among the three types of disabilities in determining which are entitled to a reasonable accommodation and which are not. Accord Williams, 380 F.3d at 774 ("[A]s all would agree, the statutory text of the ADA does not in any way distinguish

34

between actually disabled and 'regarded as' individuals in requiring accommodation." (alteration and internal quotation marks omitted)). Cf. US Airways, Inc. v. Barnett, 535 U.S. 391, 398, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (holding that "the [ADA]'s silence about the exempting effect of neutral rules" favored finding no exemption from reasonable accommodation requirement even when accommodations interfered with employer's neutral seniority system). Thus, the ADA's plain language -- which treats an individual who is disabled in the actual-impairment sense identically to an individual who is disabled in the regarded-as sense -- compels us to conclude that the very terms of the statute require employers to provide reasonable accommodations for individuals it regards as disabled.

It bears noting that this straightforward reading of the ADA is altogether consistent with the Supreme Court's interpretation of a nearly identical provision of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., in School Board of Nassau County v. Arline, 480 U.S. 273, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987). In Arline, the Court considered the claim of a school teacher afflicted with tuberculosis who argued that she had been fired because her employer regarded her as handicapped, in violation of the Rehabilitation Act's prohibition on excluding otherwise-qualified handicapped individuals from participation in federally funded

state programs. The Act's definition of "handicapped individual," then codified at 29 U.S.C. § 706(7)(B), included "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

Finding the teacher to be a handicapped individual within the Act's "regarded as" definition, the Court remanded for the district court to determine "whether the school board could have reasonably accommodated her," since "[e]mployers have an affirmative obligation to make a reasonable accommodation for a handicapped employee." Arline, 480 U.S. at 288-89 & n.19.

The Court explained the rationale for the regarded-as definition in these terms:

> By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. . . . The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments: the definition of "handicapped individual" is broad, but only those individuals who are both handicapped and otherwise qualified are eligible for relief.

Id. at 284-85. Excluding individuals regarded as disabled from the coverage of the

36

Rehabilitation Act, the Court reasoned, would leave them "vulnerable to discrimination on the basis of mythology -- precisely the type of injury Congress sought to prevent." Id. at 285.

We agree with the Third Circuit that in light of Arline and the Supreme Court's subsequent decision in Bragdon v. Abbott, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998), "the conclusion seems inescapable that 'regarded as' employees under the ADA are entitled to reasonable accommodation in the same way as are those who are actually disabled." Williams, 380 F.3d at 775 In Bragdon, the Court explained:

> The ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973 . . . . Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations. In this case, Congress did more than suggest this construction; it adopted a specific statutory provision in the ADA directing as follows: "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201(a). The directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.

Id. at 631-32 (citations omitted).

Moreover, the ADA's legislative history expressly states that "[t]he ADA incorporates many of the standards of discrimination set out in regulations

37

implementing section 504 of the Rehabilitation Act of 1973, including the obligation to provide reasonable accommodations unless it would result in an undue hardship on the operation of the business." S. Rep. No. 101-116, at 2 (1989); see also id. at 31 ("The duty to make reasonable accommodations applies to all employment decisions, not simply hiring and promotion decisions. This duty has been included as a form of non-discrimination on the basis of disability for almost fifteen years under section 501 and section 504 of the Rehabilitation Act of 1973 and under the nondiscrimination section of the regulations implementing section 503 of that Act.").

Since the Rehabilitation Act required employers to accommodate employees who were disabled in the regarded-as sense, we can find no principled basis for concluding that the more expansive ADA does not. At all events, the plain language of the ADA yields this conclusion.

The Circuits reaching the opposite conclusion have reasoned that requiring employers to accommodate individuals they merely regard as disabled would produce anomalous results that Congress could not have intended. As the Eighth Circuit put it, providing accommodations to impaired individuals who are "regarded as" disabled would "create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but

granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees." Weber, 186 F.3d at 917; see also Kaplan, 323 F.3d at 1232.

This rationale, we think, ignores the vital principle that "[c]ourts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement." Jove Eng'g, Inc. v. IRS, 92 F.3d 1539, 1552 (11th Cir. 1996) (quoting Badaracco v. C.I.R., 464 U.S. 386, 104 S. Ct. 756, 78 L. Ed. 2d 549 (1984)). As the Supreme Court explained in Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978):

> Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. . . . [I]n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with "common sense and the public weal." Our Constitution vests such responsibilities in the political branches.

Id. at 194-95; see also Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004) ("We presume 'that Congress said what it meant and meant what it said.'" (quoting United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998))).

Thus, as a court, we are not free to question the efficacy of legislation that Congress validly enacted. Within constitutional limits, Congress may

39

"improvidently" elect to legislate what the Ninth Circuit has characterized as a "windfall" for employees regarded as disabled, or may "compel employers to waste resources" that, in our sister Circuit's judgment, "would be better spent assisting those persons who are actually disabled." Kaplan, 323 F.3d at 1232. We do not think that these judgements and the complex legislative calibrations that underlie them are for us to make. Quite simply, we are without authority to pass judgment on the wisdom of a congressional enactment.

The Ninth Circuit, in reaching the opposite conclusion, reasoned: "The absence of a stated distinction [between the three alternative prongs of the 'disability' definition] . . . is not tantamount to an explicit instruction by Congress that 'regarded as' individuals are entitled to reasonable accommodations." Kaplan, 323 F.3d at 1232. We disagree. To say that the statute contains no such "explicit instruction" from Congress simply because it is necessary to plug the statutory definitions into the statute's substantive prohibition on discrimination in order to understand the precise contours of Congress' directive wholly disregards the plain meaning of the statute's language.

Moreover, because we could craft a hypothetical that produces a result we might find anomalous is insufficient reason for disregarding the terms of the statute. The Supreme Court has admonished that "[t]he plain meaning of

legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (alteration in original) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S. Ct. 3245, 3250, 73 L. Ed. 2d 973 (1982)); see also Shotz v. City of Plantation, 344 F.3d 1161, 1167 (11th Cir. 2003) ("[C]ourts may reach results inconsistent with the plain meaning of a statute [only] 'if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd.'" (alterations in original) (quoting CBS Inc. v. Prime Time 24 Joint Venture, 245 F.3d 1217, 1228 (11th Cir. 2001))).

This is decidedly not one of those rare cases. For one thing, the ADA's language is unambiguous, and none of the courts to depart from its plain meaning have pointed to anything -- congressional findings, legislative history, or other materials -- suggesting that the so-called "bizarre" results yielded by a faithful reading of the ADA are contrary to Congress' plainly expressed intent.

We also question whether the results may be as "bizarre" as our sister Circuits make them out to be, for two reasons. First, the notion that a literal reading will produce a disparity "among impaired but non-disabled employees,"

41

Weber, 186 F.3d at 917, fails to appreciate that the ADA defines individuals with impairments that do not substantially limit their ability to perform a major life activity, but that are nonetheless treated by the individual's employer as constituting such a limitation, as disabled.  The so-called "regarded as" plaintiffs are not "impaired but non-disabled" individuals, but rather are disabled within the meaning of the statute.

Second, insofar as the ADA will sometimes entitle one employee with a particular impairment to an accommodation while not entitling another with the same impairment to the same accommodation, it is because these individuals are not similarly situated: the employee entitled to statutory protection will have suffered some wrongful adverse employment action that the other employee has not.  As one court has put it, "an employee who is simply impaired and an employee who is impaired and 'regarded as' disabled are not similarly situated since the 'regarded as' disabled employee is subject to the stigma of the disabling and discriminatory attitudes of others." Jacques v. DiMarzio, Inc., 200 F. Supp. 2d 151, 170 (E.D.N.Y. 2002).  Thus, "[t]he employee whose limitations are perceived accurately gets to work, while [the plaintiff] is sent home unpaid." Williams, 380 F.3d at 775.  Cf. Barnett, 535 U.S. at 398 (holding that the ADA required accommodation even when it interfered with the employer's seniority system,

reasoning, "[t]he simple fact that an accommodation would provide a 'preference' -- in the sense that it would permit the worker with a disability to violate a rule that others must obey -- cannot, in and of itself, automatically show that the accommodation is not 'reasonable'" (emphasis omitted)).

Like the Third Circuit, "[w]hile we do not rule out the possibility that there may be situations in which applying the reasonable accommodation requirement in favor of a 'regarded as' disabled employee would produce 'bizarre results,' we perceive no basis for an across-the-board refusal to apply the ADA in accordance with the plain meaning of its text." Williams, 380 F.3d at 774. Based on the text of this statute and the absence of any contrary expression of congressional intent, we hold that an individual falling within the "regarded as" category of disability under the ADA is entitled to a reasonable accommodation no less than an individual satisfying the actual-impairment definition of disability.

III.

Because D'Angelo's vertigo condition does not substantially impair her ability to perform the major life function of working, we affirm the district court's order of final summary judgment for ConAgra on D'Angelo's actual-impairment claim.

As to D'Angelo's regarded-as claim, we affirm the district court's

43

conclusion that there is indeed a genuine issue of material fact on the question of whether ConAgra regarded D'Angelo as substantially impaired in her ability to work. We also find a genuine issue of material fact as to whether D'Angelo was a qualified individual able to perform the essential functions of her product transporter job in spite of her inability to work on a conveyor belt, and therefore reverse the district court's grant of summary judgment for ConAgra on this question. Finally, we conclude that the ADA, by its plain language, requires employers to provide reasonable accommodations for employees they regard as disabled, and reverse the district court's contrary holding.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

FAY, Circuit Judge, dissenting:

Most respectfully, I disagree with the majority's reading of this record and dissent. In my opinion, this is not a "regarded as disabled" case. In reality, it is a failure to communicate case.

As set forth by the majority, Chris D'Angelo suffers from vertigo. No, she is not disabled under the ADA, but she has a medical condition that is a problem. While she was working in the "shrimp division" of ConAgra, she talked about her problems on the conveyor belt, and accommodations were made for her. She was promoted and unfortunately transferred to the "fish division," which was under the supervision of different people. Early in her tenure in the "fish division," supervisor Mendoza assigned her to work on a box forming conveyor belt and she experienced difficulty. When she discussed this difficulty with Mendoza, he simply asked for some documentation about the condition. In response, she gave him her prescription for Antivert (which she had never filled) and a note from her doctor which read:

> This patient should not work more than 5 nights a week because of her medical condition. Also, she has a vertigo condition. This affects her when her eyes have to look at moving objects such as belts. She should avoid this situation since it could cause her to fall and sustain injury.

Mendoza passed these along to the Plan Manager, Cordy, who immediately thought it necessary to discuss the situation with the Vice President of Human

45

Resources, Yates. Cordy and Yates reviewed the note from Dr. Heng and then toured the plant. Reluctantly, they both agreed that there was literally no area of the plant where D'Angelo could work and not be around moving equipment, including, but not limited to, conveyor belts. It was their joint conclusion that she was simply "unqualified" to work in the plant. This is exactly what they told her in the September 21, 2001, letter of termination. They also explained that overtime was essential and that if she could work only five nights a week, then she would be unable to perform an integral part of her job.

My reading of this record convinces me that it is a simple case of an employer deciding that it had to terminate an employee because of a medical condition that made it dangerous for her to work in the plant. Based upon the doctors note, she was not qualified to work for ConAgra in this facility.

The majority refuses to accept this version of the uncontested facts by relying upon other facts that are simply irrelevant. The fact that she had worked there for about three years without being injured changes nothing. The employer did not know about the risk. Neither D'Angelo nor Dr. Heng had ever advised those with the authority to evaluate such risks of D'Angelo's condition. It is fortunate that she did not experience an attack of vertigo that resulted in injury during this period. In addition, to rely upon a note from Dr. Heng written in

46

January of 2002, as the majority does in footnote 6, is really comparing apples to oranges. D'Angelo was terminated in September 2001.

Moreover, it's important to note that three months after her termination, D'Angelo asked Dr. Heng to write a note clarifying his earlier indication that she could not be around belts in order to help her in her grievance action against ConAgra. Although D'Angelo cannot remember whether she gave that note to anyone at ConAgra, including her union representative, she was clear in the fact that the note was meant to explain to ConAgra the job functions she could and could not perform. At no time, however, did D'Angelo ever seek re-employment at the plant after she had this note. To the contrary, D'Angelo secured other employment at Target as a shelf stocker on the night shift in June of 2002. This lawsuit was not filed until September 2002.

As I stated earlier, this is really a case of failure to communicate. If D'Angelo had told ConAgra of her problem when she first applied, it could have been explored and clarified. If D'Angelo had obtained a clarifying note from Dr. Heng before she was terminated, perhaps it could have been resolved. Or, on the other hand, maybe it really is dangerous for her to work around moving equipment because she might have an attack and be injured.[1]

---

[1] It is not hard to know what her lawyers would be arguing had Conagra ignored the doctor's note, and allowed D'Angelo to continue working, ultimately being injured after an onset

47

In any event, it seems to me that the summary judgment is fully supported by this record and the law. Chris D'Angelo is not disabled under the ADA. Chris D'Angelo was never regarded as disabled by her employer. The authorities at ConAgra made a sound business decision when they terminated D'Angelo based upon their opinion that she was not qualified to work in this plant.

Consequently, I would affirm.

---

of vertigo.