Frederick KAPLAN, Plaintiff–
Appellant,

v.

CITY OF NORTH LAS VEGAS;
Thomas H. Stephens, De-
fendants–Appellees.

No. 02–16048.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 2003.

Filed April 1, 2003.

James C. Gallo, Law Office of Andrew M. Leavitt, Las Vegas, Nevada, for the plaintiff-appellant.

Malani L. Kotchka, Smith & Kotchka, Las Vegas, Nevada, for the defendants-appellees.

Before SILVERMAN, GOULD, Circuit Judges, and WEINER,* Senior District Judge.

## OPINION

GOULD, Circuit Judge.

Plaintiff–Appellant Frederick Kaplan was a peace officer employed by the Defendant–Appellee City of North Las Vegas (City). After being injured in a training exercise, Kaplan could not hold a gun or grasp objects with his right hand. When Kaplan's pain continued after therapy sessions, Kaplan's slow recovery was attributed to rheumatoid arthritis, a conclusion later determined to be a misdiagnosis. Based on this misdiagnosis, the City believed Kaplan's injury was permanent. The City fired Kaplan.

Kaplan filed suit under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, against the City.[1] The complaint alleged that the City discriminated against Kaplan by terminating him from his peace officer position because of a disability, rheumatoid arthritis. The United States District Court for the District of Nevada granted the City's motion for summary judgment after concluding that Kaplan could not show that he is a "qualified individual with a disability" within the meaning of the ADA. On this appeal we consider (1) whether Kaplan could perform the essential functions of a peace officer position without an accommodation and (2) whether Kaplan was entitled to reasonable accommodation when the City regarded him as having a disability even though he did not have an actual disability.

I

The City hired Kaplan in 1989 as a deputy marshal, or peace officer. According to the City's 1991 description of the deputy marshal position, a deputy marshal must be able to perform the following essential job functions: (1) use of force while "restraining prisoners during altercations," (2) "frequent to constant use of hands and arms in reaching, handling, grasping, gripping, and fingering while operating . . . firearms and restraining arrestees," and (3) physical demands including "hand-to-hand combat."[2]

In a joint pretrial order, Kaplan and the City stipulated that as a deputy marshal (1) Kaplan used his thumb, fingers and handgrip to apply handcuffs in a combative situation, (2) Kaplan had to restrain people using his hands, and (3) Kaplan's job required the constant use of both hand and arms for grasping and gripping while key-

---

* The Honorable Charles R. Weiner, Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Thomas H. Stephens, in his official capacity as the City Director of Human Resources, is also a defendant. When we refer to the "City," we also refer to Stephens as a defendant acting on behalf of the City.

2. This description was modified in May, 1994. The later description did not include the same details regarding essential job functions, but rather indicated that the deputy marshals must meet "annual physical fitness department standards" and must be able to use firearms. The City's standards and training manual for peace officers defines "duties of a peace officer" to mean "those functions that may involve the use of force and the arrest or detention of a person."

boarding, filing, telephoning, operating controls, driving, and required the ability to use firearms.

Kaplan seriously injured his right wrist and thumb during a defensive tactics training exercise on May 3, 1995. He was medically treated through the City's industrial compensation program and reassigned to a civilian light duty position as an Inmate Worker Coordinator on May 23, 1995. As an Inmate Worker Coordinator, Kaplan supervised "inmate workers in a variety of housekeeping tasks related to City buildings/ vehicles and commercial type laundry service tasks with the detention facility to ensure proper and efficient performance." In this position, Kaplan was not required to arrest or detain any of the prisoners; he did not use a firearm or handcuffs.

Upon referral, on May 23, 1995, Kaplan went to Nova Care Outpatient Rehabilitation Center. He complained of right hand pain when holding objects such as his gun. He rated his pain 10 out of 10 while holding objects in his right hand. From June 14 to 16, 1995, Kaplan continued to experience "extreme pain in regard to his right thumb when he grasped something with it." As of July 6, 1995, Kaplan reported pain "so intense that if he [did] not let go of an object, pain [would] travel proximally up his arm until he drop[ped] whatever he [was] holding."

On July 17, 1995, Kaplan went to see Dr. Mark Reed, who noticed that when he and Kaplan shook hands, "[Kaplan] exhibit[ed] facial grimacing, groaning, swearing, and strange pain behavior, jerking, grabbing the right upper extremity and holding it for a period of about ten seconds, with later relief." Dr. Reed recommended more physical therapy sessions at Nova Care and ordered testing for arthritis.

On August 1, 1995, Kaplan told a Nova Care therapist that he "feared the possibility that he would be unable to hold onto a prisoner because of the pain in his right hand." That same day, Dr. Reed concluded that, based on a bone scan and elevated rheumatoid factor in his blood, Kaplan had rheumatoid arthritis of a non-industrial and pre-existing nature. Dr. Reed recommended "a full duty work release, with his employer to evaluate his ability to handle a gun."

Kaplan gave Dr. Reed's full duty release except for gun handling to Deputy Chief Harlan Enlow. Despite Dr. Reed's release, Kaplan was kept on light duty. On August 25, 1995, Enlow offered Kaplan the opportunity to qualify at the pistol range.[3] Kaplan, however, did not accept this opportunity because department rules do not permit employees to qualify on the gun range until they are released to full duty by a doctor.

On August 30, 1995, Kaplan had an appointment with Dr. Timothy Deneau, a physician that routinely performed "fitness-for-duty" evaluations for the City. Dr. Deneau concluded that Kaplan suffered from rheumatoid arthritis and that any work-related injury sustained in May 1995 had stabilized. Having determined that Kaplan's condition was permanent, Dr. Deneau concluded:

> I do not feel that Mr. Kaplan is able to perform the required essential functions of the job, which requires constant use of the hand in grasping and gripping, specifically I do not believe he can hold a hand gun and use a firearm to qualify as required under state regulations. In fact, it may be a safety concern for himself, coworkers and other[s], that he may not be able to use his firearm effectively. He may also not be able to grasp

---

**3.** Deputy marshals are required to "qualify" at a pistol range every six months in order to prove they are capable of accurate handling of their firearms.

and detain suspects, if required, using the right hand.

In the morning of August 31, 1995, Kaplan requested Enlow to give him an opportunity to qualify at the gun range. Enlow denied the request because Kaplan had not yet been released by a doctor to do so. Later that day, Kaplan was terminated. The termination letter noted that Kaplan had been diagnosed with rheumatoid arthritis and noted a concern for Kaplan's ability to use a firearm:

> Earlier this date, Dr. Deneau informed this office that you *cannot* perform the essential function of your job as Deputy Marshal. The doctor has indicated that you cannot properly handle a gun, that your medical condition presents a risk to yourself and others (in that you could easily have your weapon taken away), and that you cannot properly defend yourself, should you become involved in an altercation. Based on the above, the City has reached its decision to terminate you.

(Emphasis in the original.)

Six days after termination, Kaplan qualified on the gun range at "Shooter's World" on his own initiative. He did not request and was not offered reinstatement. In his deposition, Kaplan testified that he did not recover the ability to perform activities that would constitute essential job functions, e.g. handling controls or driving, until 1996. In the spring of 1998, Kaplan's physician and an independent physician retained by the City determined that Kaplan never suffered from rheumatoid arthritis.

On June 7, 1996, Kaplan filed a complaint in the United States District Court for the District of Nevada, claiming viola-tions of the ADA. On April 13, 1999, the district court granted the City's motion for summary judgment on grounds that Kaplan did not have a "disability" within the meaning of the ADA. On Kaplan's first appeal, we reversed and remanded, concluding that "Kaplan raised a genuine issue of fact that the City regarded him as unable to perform any peace officer position in the State of Nevada." *Kaplan v. City of North Las Vegas*, 2 Fed. Appx. 727, 728 (9th Cir.2001) (unpublished opinion). On January 22, 2002, the City filed a second motion for summary judgment, which the district court granted on April 22, 2002, concluding that Kaplan failed to establish he was a "qualified individual with a disability" under the ADA. This appeal follows.

## II

 The ADA represents a Congressional judgment that an individual's education, experience, will to succeed, and adaptability may often overcome mere disability. The ADA prohibits discrimination against a "qualified individual with a disability" because of the disability. 42 U.S.C. § 12112. To sustain a claim under the ADA, Kaplan must show that (1) he is "disabled" within the meaning of the Act; (2) he is a "qualified individual" within the meaning of the Act; and (3) he was terminated because of his disability. The district court granted the City summary judgment after concluding that Kaplan was not a "qualified individual" under the ADA.[4] We review the district court's grant of summary judgment de novo and view the facts in the light most favorable to

---

4. Although we have previously held that Kaplan raises a genuine issue of material fact whether he is "disabled" within the meaning of the ADA, *see Kaplan,* 2 Fed. Appx. at 728, summary judgment may nevertheless be appropriate if no reasonable trier of fact could find that Kaplan is a "qualified individual." We address that step of the ADA analysis in this appeal.

Kaplan. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).

The Act defines "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine whether Kaplan is a "qualified individual" we must resolve two issues: (1) whether Kaplan was able to perform the essential functions of the peace officer position at the time of his termination without an accommodation, and (2) whether Kaplan was entitled to reasonable accommodation to help him perform the essential job functions of a peace officer.

### A.

■ We first address whether Kaplan could perform the essential job functions of a deputy marshal without accommodation at the time of his termination. *See Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir.2000) (holding an employee must be able to perform essential job functions at the time of termination). We conclude that he could not.

As a part of the essential job functions of a deputy marshal Kaplan was required to restrain prisoners, use firearms, and engage in hand-to-hand combat. In a joint pretrial order filed before the magistrate judge in January, 2002, Kaplan stipulated that: (1) "Kaplan had to use his hands to perform functions of his job;" (2) "Kaplan used his thumb, fingers, and handgrip to control the handcuffs in order to apply them in a combative situation;" (3) "As a part of his duties, it was necessary for Kaplan to physically restrain people by using his hands;" (4) "As part of his *essen-*

*tial job functions*, Kaplan was required to have the constant use of both hands/arms . . . and *to be able to use firearms.*" (Emphasis added.)

It is also undisputed that at the time of his termination Kaplan suffered from severe pain in his right hand, which prohibited him from grasping objects for prolonged periods of time. He admitted the following facts in the joint pretrial order: (1) On May 23, 1995, he complained of increased pain while holding objects such as his gun; (2) From June 14 to 16, 1995, he experienced "extreme pain in regard to his right thumb when he grasped something with it;" and (3) On August 1, 1995, he specifically told a therapist that he "feared the possibility that he would be unable to hold onto a prisoner because of the pain in his right hand." In his deposition, Kaplan testified that he did not recover the ability to perform activities that would constitute essential job functions, e.g. grasping or driving, until 1996, though the pain was still there but getting better.

Kaplan argues that the City should have sent Kaplan to the pistol range to determine whether he was able to handle a firearm. Although an opportunity to qualify at the pistol range may have settled whether Kaplan could use his firearm, it would not have settled whether Kaplan would be able to restrain prisoners or effectively use his handcuffs and defensive tactics in a combative situation. The uncontroverted medical evidence presented to the City at the time of termination indicated that Kaplan had difficulty grasping and holding on to objects. Given the undisputed medical records [5] and Kaplan's admissions, there is no genuine issue of material fact whether Kaplan could per-

---

**5.** Kaplan presented controverted medical evidence regarding whether he had rheumatoid arthritis but does not present evidence challenging the severe pain in his right hand and

his inability effectively and safely to hold objects, including prisoners, at the time of termination.

form the essential job functions of a deputy marshal at the time of termination. He could not do so, for even viewing the evidence in light most favorable to Kaplan, when terminated he could not reliably restrain prisoners, detainees, or others whom he might encounter on the job.

## B.

■ The ADA prohibits discrimination against individuals with disabilities who are able to perform essential job functions "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Reasonable accommodations may include making facilities accessible to individuals with disabilities, adjusting work policies, or reassignment to vacant positions. 42 U.S.C. § 12111(9). Having concluded that Kaplan could not perform the essential job functions of a deputy marshal at the time of termination *without* accommodation, the next issue is whether Kaplan was entitled to reasonable accommodation to help him perform the essential functions of the peace officer position.

The Act defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being *regarded as* having such an impairment." 42 U.S.C. § 12102(2) (emphasis added). The crux of Kaplan's ADA claim is that the City fired him because City officials thought Kaplan was permanently disabled by rheumatoid arthritis. But rheumatoid arthritis did not prevent Kaplan from fully recovering from his work-sustained injury. Eventually, he did recover. Because Kaplan was allegedly fired based on a misdiagnosis, Kaplan seeks relief under the ADA as an individual who was "regarded as" having a disability, 42 U.S.C. § 12102(2)(3), not as someone who is actually disabled.

Whether "regarded as" plaintiffs are entitled to reasonable accommodation under the ADA is an issue of first impression for this circuit. Some circuits have considered the issue and concluded that "regarded as" plaintiffs are not entitled to reasonable accommodations under the ADA. *See Weber v. Strippit, Inc.,* 186 F.3d 907, 916–17 (8th Cir.1999) (holding that "regarded as" disabled plaintiffs are not entitled to reasonable accommodation); *Workman v. Frito–Lay, Inc.,* 165 F.3d 460, 467 (6th Cir.1999) (same); *Newberry v. E. Texas State Univ.,* 161 F.3d 276, 280 (5th Cir. 1998) (same); *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 148 n. 12 (3d Cir.1998) (en banc) (declining to rule on this issue but noting that the argument that employers are not required to provide reasonable accommodation for perceived disabilities has "considerable force"). *But see Katz v. City Metal Co., Inc.,* 87 F.3d 26, 33 (1st Cir.1996) (allowing "regarded as" plaintiff to proceed, concluding that whether plaintiff could have performed his job with reasonable accommodation was an issue for the jury)[6]; *Jacques v. DiMarzio, Inc.,* 200 F.Supp.2d 151, 163 (E.D.N.Y.2002) (recognizing that the Second Circuit Court of Appeals has yet to decide the issue but concluding that employers have a duty to accommodate in "regarded as" cases).

■ Though the weight of circuit authority disfavors interpreting the ADA to require accommodation for "regarded as" plaintiffs, we think it appropriate to approach this important issue with our own analysis. We begin with this principle: "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if

---

**6.** The First Circuit in *Katz* assumes that "regarded as" plaintiffs are entitled to reasonable accommodation without providing analysis.

that is plain, ... the sole function of the courts is to enforce it according to its terms." *Carson Harbor Village, Ltd. v. Unocal, Corp.,* 270 F.3d 863, 878 (9th Cir. 2001) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). We must therefore start analysis by pondering the language of the ADA.

On the face of the ADA, failure to provide reasonable accommodation to "an otherwise qualified individual with a disability" constitutes discrimination. 42 U.S.C. § 12112(b)(5)(A). And, on its face, the ADA's definition of "qualified individual with a disability" does not differentiate between the three alternative prongs of the "disability" definition. 42 U.S.C. §§ 12102(2), 12111(8). The absence of a stated distinction, however, is not tantamount to an explicit instruction by Congress that "regarded as" individuals are entitled to reasonable accommodations. Moreover, because a formalistic reading of the ADA in this context has been considered by some courts to lead to bizarre results, *Weber,* 186 F.3d at 917, we must look beyond the literal language of the ADA. *See Royal Foods Co., Inc. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1108 (9th Cir.2001) (recognizing a court must look beyond the plain language of a statute when the literal interpretation would lead to an absurd result).

> In *Weber,* the Eighth Circuit explained: The ADA cannot reasonably have been intended to create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees. Accordingly, we hold that "regarded as" disabled plaintiffs are not entitled to reasonable accommodations.

186 F.3d at 917. We find this reasoning persuasive and agree with the Eighth Circuit's analysis and holding.

If we were to conclude that "regarded as" plaintiffs are entitled to reasonable accommodation, impaired employees would be better off under the statute if their employers treated them as disabled even if they were not. This would be a perverse and troubling result under a statute aimed at decreasing "stereotypic assumptions not truly indicative of the individual ability of [people with disabilities]." 42 U.S.C. § 12101(a)(7). Dispelling stereotypes about disabilities will often come from the employees themselves as they demonstrate their capacity to be productive members of the workplace notwithstanding impairments. Were we to entitle "regarded as" employees to reasonable accommodation, it would do nothing to encourage those employees to educate employers of their capabilities, and do nothing to encourage the employers to see their employees' talents clearly; instead, it would improvidently provide those employees a windfall if they perpetuated their employers' misperception of a disability. *See Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 196 (3rd Cir.1999) (not deciding the issue but noting that "it seems odd to give an impaired but not disabled person a windfall because of her employer's erroneous perception of disability"). To require accommodation for those not truly disabled would compel employers to waste resources unnecessarily, when the employers' limited resources would be better spent assisting those persons who are actually disabled and in genuine need of accommodation to perform to their potential.

■ Having carefully considered the arguments for and against entitling "regarded as" plaintiffs to reasonable accommodations, we recognize that it is not an easy question because of the language of the

statute, but we hold that there is no duty to accommodate an employee in an "as regarded" case. Because Kaplan is not actually disabled, the City did not have a duty to accommodate him.[7]

## III

Kaplan could not perform the essential functions of the deputy marshal position and the City did not have a duty to accommodate him. The ADA therefore does not entitle Kaplan to relief. The district court correctly granted summary judgment to the City.

**AFFIRMED.**

---

7. Because the City did not have a duty to accommodate Kaplan, we need not address the issue he raises whether transforming Kap- lan's light duty position into a permanent position would have been a reasonable ac- commodation.