PREGERSON, Circuit Judge,
dissenting.
I respectfully dissent. I read section 203 of the Voting Rights Act, 42 U.S.C. § 1973aa-la, to require the translation of recall petitions circulated in areas with significant limited-English proficient voter populations. In this case, the purpose of the Voting Rights Act was undermined when the recall petitions were printed only in English and limited-English proficient voters were deprived of their right to fully understand a petition they were solicited to sign.
I. The Voting Rights Act of 1964
In 1975, Congress amended the Voting Rights Act to include section 203, which requires certain jurisdictions to provide bilingual voting materials. See 42 U.S.C. § 1973aa-1a; Zaldivar v. City of Los Angeles, 780 F.2d 823, 826 (9th Cir.1986), overruled on other grounds by Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). Section 203’s broad remedial purpose was directed at a problem that continues to confront many United States citizen immigrants. Specifically, their “inability or limited ability to read English obviously thwarts any attempt to knowledgeably participate in the electoral process.” H.R.Rep. No. 102-655, at 3 (1992). It is clear that Congress understood the severity of the wrong inflicted on limited-English proficient voters: “The inability of members of language minority populations to comprehend the ballot and voting related information provided solely in English prevented and continues to prevent them from casting an effective vote.” Id. at 5. “[T]he use of English, as the sole language throughout the electoral process, continues to be discriminatory and has a direct and invidious impact upon the ability of such populations to participate actively in the electoral process.” Id. Thus, section 203 was enacted with a broad remedial purpose: “to ensure that language minority populations have substantive access to the ballot.” Id.
Permitting the use of English-only petitions contravenes the Voting Rights Act, which Congress designed for use “throughout the electoral process.” Id. In essence, English-only petitions would perpetuate the very injustice the Voting Rights Act seeks to eliminate-the exclusion of “single language minority” voters from a vital stage of the electoral process. 42 U.S.C. § 1973aa-la(b)(2)(A). I do not believe that this was Congress’s intent. The majority’s interpretation gives voters proficient in English a preference over limited-English proficient voters. Indeed, the majority entirely writes off full participation by significant portions of the voting population in the recall process.
*1057 II. The Voting Rights Act and Recall Petitions
Section 203 of the Voting Rights Act requires translation into the jurisdiction’s minority language(s) whenever a state or political subdivision “provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots.” 42 U.S.C. § 1973aa-la(c). Thus, the essential questions here are: (1) whether recall petitions are “other materials or information relating to the electoral process,” and (2) whether the Orange County Elections Department “provided” the recall petitions.
As a remedial statute, the Voting Rights Act is to be construed broadly so as to achieve the Act’s objectives. See Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (“[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.”). The Supreme Court has explained that “[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying -citizens their right to vote because of their race.” Allen v. State Bd. of Elections, 393 U.S. 544, 565, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (footnote omitted). Thus, in Allen, the Supreme Court “reject[ed] a narrow construction ... to § 5 [of the Voting Rights Act]” and concluded that “the [Voting Rights] Act gives a broad interpretation to the right to vote, recognizing that voting includes ‘all action necessary to make a vote effective.’ ” Id. at 565-66, 89 S.Ct. 817.[1] It is this well-established canon of statutory construction that must guide the analysis here.
A. Recall Petitions Are “Voting Materials”
Section 203 defines “voting materials” to “mean[ ] registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots.” 42 U.S.C. § 1973aa-la(b)(3)(A). It does not, however, define what constitutes “other materials or information relating to the electoral process.” Id. Where a statute fails to define a key term, this court’s “duty, in matters of statutory construction, is to give effect to the intent of Congress.” San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.2004) (quoting A-Z Int'l v. Phillips, 323 F.3d 1141, 1146 (9th Cir.2003)). “To this end, ‘it is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms.’ ” Id. (quoting Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1231-32 (9th Cir.2003)). “When a statute does not define a term, a court should construe that term in accordance with its ‘ordinary, contemporary, common meaning.’ ” Id. (quoting A-Z Int'l, 323 F.3d at 1146 (citation omitted)). “Only if an ambiguity exists in the statute, or when an absurd construction results, does this court refer to the statute’s legislative history.” Id.
*1058 “To determine the ‘plain meaning’ of a term undefined by a statute, resort to a dictionary is permissible.” Id. Black’s Law Dictionary defines “related” to mean “to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.” Black’s Law Dictionary 1289 (6th ed.1991). Supreme Court and Ninth Circuit precedent suggest that this broad definition of “related” is an appropriate one to use here. See, e.g., Morales v. Trans World Airlines, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (noting that ordinary meaning of “relating to” is “a broad one”); Aloha Islandair Inc. v. Tseu, 128 F.3d 1301, 1302 (9th Cir.1997) (“The phrase ‘relating to’ should be construed broadly to mean ‘has a connection with or reference to.’ ”). Based on this reading, recall petitions clearly have some “bearing or concern” and are “connected with” an election. Indeed, recall petitions serve no other purpose than to trigger an election. As this court has explained,
The election itself is merely the culmination of th[e electoral] process. It includes those acts that a citizen must perform to establish his eligibility as a voter, as well as those acts that a candidate must perform to place his name on the ballot. The range of conduct “relating to the elector! ]al process” includes, for example, compliance by a would-be voter with statutes regulating registration and compliance with other statutes to place a name or an issue on the ballot. That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature.
Zaldivar, 780 F.2d at 833. Zaldivar rejected “ft]he argument that a recall notice is only a preliminary step to voting and therefore is unaffected by the bilingual provisions of the [Voting Rights] Act.” Id. at 833 n. 11.
Looking beyond the statutory text, in the Department of Justice’s regulations implementing section 203, the U.S. Attorney General has defined “written materials” to “include, for example, ballots, sample ballots, informational materials, and petitions.” 28 C.F.R. § 55.19(a) (emphasis added). While the Attorney General’s views are not binding on this court, they are persuasive and bolster the conclusion that recall petitions are “other materials relating to the electoral process.” Furthermore, it is important to note that courts owe considerable deference to the Attorney General’s construction of the Voting Rights Act, particularly where the language of that interpretation mirrors the Act’s own language. See United States v. Sheffield Bd. of Comm’rs, 435 U.S. 110, 131-32, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978); City of Pleasant Grove v. United States, 479 U.S. 462, 468, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987) (noting that the Attorney General’s interpretation of the Voting Rights Act is entitled to considerable deference and that “Congress was aware of the Attorney General’s view in this regard, and implicitly approved it, when it reenacted the Voting Rights Act in 1982”).[2]
*1059 The Attorney General’s inclusion of the word “petition” in the definition of “written materials” is consistent with the Justice Department’s position that the Voting Rights Act’s purpose is to “enable members of applicable language minority groups to participate effectively in the electoral process.” 28 C.F.R. § 55.2(b).[3]
The district court’s conclusion that the Voting Rights Act applies only when a vote is cast between two or more alternative choices relies on too restricted a reading of Congress’s intent in requiring bilingual voting materials. Such a narrow reading of this statute is contrary to the general rule that such remedial statutes are to be broadly construed. See Allen, 393 U.S. at 565-66, 89 S.Ct. 817; see also Tcherepnin, 389 U.S. at 336, 88 S.Ct. 548. The Supreme Court’s decision in Allen is instructive here. There the Court concluded that the petition process to place a candidate’s name on an electoral ballot constituted a “standard, practice, or procedure with respect to voting” under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Allen, 393 U.S. at 569-70, 89 S.Ct. 817. The recall petition process is comparable to the nomination process at issue in Allen as both are preliminary steps to an election. While we are concerned with section 203 of the Voting Rights Act, the language specifically at issue here — “materials ... related to the electoral process,” 42 U.S.C. § 1973aa-la(c) (emphasis added) — is at least as broad as that of section 5 — “standard, practice, or procedure with respect to voting,” 42 U.S.C. § 1973(c) (emphasis added) — construed by the Court to include the nomination process.
The district court’s reasoning also ignores the simple fact that recall petitions do implicate a decision between two alternatives, i.e., a choice between (1) recalling the officeholder by signing, and (2) not recalling the officeholder by not signing the petition. California election law requires that a certain percentage of registered voters join in a call to recall an official by signing a valid, pre-approved petition. See Cal. Elec.Code § 11221. An effective way to choose to keep a challenged incumbent in office is to refuse to sign the proffered petition, thereby reducing the likelihood that the recall election will occur.[4] Thus, the choice whether to sign or not sign a recall petition can have a tremendous impact on the fate of the in *1060 cumbent. Indeed, in the First Amendment context, the right to vote is inextricably tied to the right to petition and petition signatures are treated the same as votes for constitutional purposes. See Green v. City of Tucson, 340 F.3d 891, 893 (9th Cir.2003); see also Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 186, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (noting that under First Amendment, petition circulation “is core political speech because it involves interactive communication concerning political change” (internal quotations omitted)); Meyer v. Grant, 486 U.S. 414, 421, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (“The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.”). Given the importance of petitions to recall procedure, they should be deemed “voting materials” that a person solicited has a right to understand.
B. “Provided By” the Orange County Elections Department
Although I believe that recall petitions relate to the recall process, the recall petitions would only fall under the Act’s bilingual requirements if they were “provided by” the Orange County Elections Department. 42 U.S.C. § 1973aa-la(c). Because the state’s acquiescence in the content of recall petitions is a condition precedent to its circulation, I believe the state provides recall petitions to the public.
Recall petitions in California are subject to extensive regulations that go beyond imposing mere ministerial duties upon election officials. See Cal. Elec.Code § 11000-11047. Under these regulations, the state, or in this case the Orange County Elections Department, has the authority and obligation to authorize and approve the form and content of proposed recall petitions, verify collected signatures, and set election dates. See Cal. Elec.Code § 11042, 11043. No signatures may be collected on a recall petition unless and until the Orange County Elections Department notifies the petition’s proponents that the form and wording of the proposed petition comply with the Elections Code. See Cal. Elec.Code § 11042(d).
California’s Elections Code mandates a specific format for recall petitions that must be used by recall proponents. See Cal. Elec.Code § 11041(a) (“[Pjroponents shall use the recall petition format provided by the Secretary of State.”). While private persons' may print the actual recall petitions, the form must adhere to the statutory requirements, which regulate the content and even the typeface to be used on such petitions. See id. The proponents must file, within ten days of receipt the recall target’s answer, two blank copies of the recall petition with the jurisdiction’s election officials. See Cal. Elec.Code § 11042(a). Election officials are charged with ensuring that the proposed petition conforms to the requirements of the Election Code in both form and content. See id. If election officials determine that a proposed petition does not comply, they must issue written findings. See Cal. Elec. Code § 11042(b). In such cases, officials must notify the proponents of the alterations necessary for the petition’s approval. See Cal. Elec.Code § 11042(c).
The Elections Code also dictates the contents of a recall petition, requiring that each page of the petition include: (1) a request that an election be called to recall an officeholder; (2) a copy of the Notice of Intention; (3) a written statement of the grounds for the recall; (4) the names of at least ten recall proponents that appear on the Notice of Intention; (5) any answer filed by the officer sought to be recalled or a statement that the official did not answer; and (6) the name and title of the officer sought to be recalled. See Cal. Elec.Code §§ 11020(a)-(d), 11023(a), *1061 11041(a). California election officials must also approve the content of the recall petition. See Cal. Elec.Code § 11042(a) (charging election officials with “ascertaining] if the proposed form and wording of the petition meets the requirements of this chapter” (emphasis added)). Indeed, recall proponents are statutorily required to change their recall petition as directed by election officials until the officials are satisfied that no further alterations are required. See Cal. Elee.Code § 11042(c).
California law prohibits any private party from circulating a recall petition until the petition receives state approval. See Cal. Elec.Code § 11042(d) (“No signature may be affixed to a recall petition until the elections official or, in the case of the recall of a state officer, the Secretary of State, has notified the proponents that the form and wording of the proposed petition meet the requirements of this chapter.”). Signed petitions must be submitted to the proper election officials for certification. See Cal. Elec.Code §§ 11222, 11224, 11227. If enough signatures have been collected, the recall election is called and scheduled by election officials. See id.
Considering this extensive regulation, I can only conclude that recall petitions are not the same as fliers or candidate literature wholly created and controlled by private parties. See Zaldivar, 780 F.2d at 833 (“That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature.”). Rather, they are more akin to ballots or initiative materials that are distributed by voting districts or to the nomination petition at issue in Allen.
Here, the recall petitions, in English only, were submitted to the Orange County Elections Department as required by California law. By reviewing and approving the Recall Petition for circulation, the Orange County Elections Department officially sanctioned the content and format of the petition, including its English-only printing.[5] Election officials could have altered the text of the petition or demanded that the recall proponents publish it in Spanish as well as English, but chose not to do this and instead approved the petitions in their English-only form. This state approval, together with the extensive state regulation of the form of the petitions is sufficient state involvement to trigger application of the bilingual requirements and to conclude that the state “provided” the Recall Petition within the meaning of the Voting Rights Act.
III. Relevant Case Law
The majority states that its holding is supported by two out-of-circuit cases. Maj. Op. at 1051. In the first case, Montero v. Meyer, 861 F.2d 603 (10th Cir.1988), the Tenth Circuit held that initiative petitions do not fall under the Voting Rights Act’s bilingual requirements. See id. at 609-10. In Montero, the plaintiffs challenged initiative petitions circulated by members of the Official English Committee seeking to amend the Colorado Constitution to make English the state’s official *1062 language. See id. at 605. According to the Tenth Circuit, the “electoral process” did not commence until a measure qualified for placement on the ballot and signing an initiative petition was not “voting” within the meaning of the Voting Rights Act. Id. at 607. The court further held that petitions were not “provided by” the state such as to make the minority language provisions operable. Id. at 609-10. Rather, the court reasoned that the state’s actions in approving the initiative petitions were merely “ministerial” and did not alter the character of the petitions or render their circulation “state action.” Id. at 610.
Employing similar reasoning, the Eleventh Circuit reached the same conclusion in Delgado v. Smith, 861 F.2d 1489 (11th Cir.1988). Like Montero, Delgado also involved a proposed citizen initiative to make English the official language of Florida. See id. at 1491. The court concluded that the Voting Rights Act did not apply because Congress did not intend the bilingual requirements to apply to private citizens. See id. at 1492. In addition, Florida election officials’ involvement in approving the initiatives was “ministerial” and did not constitute “state action.” See id. at 1495-96. Thus, the initiative to amend Florida’s Constitution to make English the state’s official language did not require translation into minority languages under the Voting Rights Act. See id. at 1498.
Those two cases are readily distinguishable from the.instant case. First, California’s statutory scheme is more stringent than those in Colorado or Florida, making the Orange County Elections Department’s approval of the Recall Petition more than “merely ministerial.” Neither Florida’s nor Colorado’s statutory and regulatory schemes governing initiative petitions are structurally equivalent to California’s scheme. For example, under Florida law, Florida election officials are limited to verifying only that a proposed initiative petition complies with applicable format requirements; the regulations do not provide for a review of the petition’s contents. See Fla. Admin. Code Ann. r. 1S-2.009(1) (“The Division shall review the form for sufficiency of the format only.”). In contrast, California election officials are charged with authorizing and approving the form and content of the recall petition. See Cal. Elec.Code § 11042(a) (charging election officials with “as eertain[ing] if the proposed form and wording of the petition meets the requirements of this chapter”) (emphasis added).
While Colorado empowers election officials to suggest revisions to a petition’s content, such revisions are merely suggestions: recommendations made regarding format or con tent are discretionary to the petitioner. See Colo.Rev.Stat. § 1-10-105(2) (“[T]he proponents may amend the petition in response to some or all of the comments of the directors of the legislative council and the office of legislative legal ser vices, or their desig-nees.”) (emphasis added). Unlike Colorado, California recall proponents are statutorily required to alter their recall petition as directed by election officials until those officials are satisfied that no further alterations are required. Compare Cal. Elec.Code § 11042(a), (c), with Colo.Rev.Stat. § 1-40-105(2).
Not only are the cases distinguishable, but they demonstrate the problem with excluding pre-election petitions from section 203’s requirements for translation. Both Montero and Delgado concerned petitions to qualify English-only initiatives to amend their respective state constitutions. These cases ironically excluded limited-English proficient voters from knowledgeably deciding whether to sign a petition for a ballot which sought to enshrine an English-only requirement into their state constitutions. Such a result cannot be what *1063 Congress intended when it enacted section 203 to remedy past language discrimination in voting practices by enforcing the guarantees of the Fourteenth and Fifteenth Amendments to the Constitution and to ensure that citizens of language minorities are no longer effectively excluded from full participation in the electoral process. See 42 U.S.C. § 1973aa-la(a).
IV. Fraud
It is important to emphasize the fraud that occurred in this case. Here, the recall proponents disingenuously claimed that those who signed the petition would receive information about Nativo Lopez, a school board member. Instead, those voters were signing a petition to recall Lopez. Because the petition’s signers were limited-English proficient voters, they were unable to determine whether they were being deceived.
Fraud-prevention lies at the heart of the Voting Rights Act because the Act ensures that all voters- — -including minority language speakers — have equal opportunities to understand voting materials. The majority minimizes this problem, suggesting that other means of remedying petition fraud exist.
Maj. Op. at 1053. But the fact that multiple remedies exist does not mean Congress did not intend section 203 to remedy fraud. Moreover, the majority’s suggestion that every deceived signer may rescind his or her signature and report the incident, as one voter did in this case, is unworkable. That “remedy” assumes that the non-English speaker would at some point recognize that he or she had been tricked, which seems unlikely except in rare occasions. Furthermore, imagine the havoc it would wreak on election results and voter confidence to have entire elections questioned months, if not years, after an elected official took office because of fraudulently induced petition signatures. It is clearly preferable to avoid such problems before actual recall and initiative elections by taking the simple step of ensuring that all voters have equal access to information and are protected from the sort of discriminatory practices and exclusions the Voting Rights Act was designed to prevent.
This case demonstrates why section 203 must be interpreted to require the translation of petitions. Congress has recognized that “without a federal mandate, much needed bilingual assistance in the voting process, meant to ensure the guarantees of the Fourteenth and Fifteenth Amendments, may disappear.” H.R.Rep. No. 102-655, at 3 (emphasis added). Certainly the “discrimination ... encountered by these minority language populations” that the Voting Rights Act was enacted to remedy includes fraud perpetrated on minority language voters at all stages of the electoral process. Id. The Voting Rights Act should serve to prevent the class of fraud that occurred in this case.
We cannot catalogue every deceptive method used by signature gatherers. But when we have identified one of their methods — lying to minority-language speakers about the content of recall petitions- — we should not tolerate it. As a broad remedial provision, section 203 should not be a tool to help recall or initiative proponents perpetrate deception.
V. Chilling Effect
The majority and Defendants speculate about a hypothetical chilling effect that requiring petitions to be translated would have on petition proponents. Maj. Op. at 1053. Increased costs, however, are a secondary concern in the realm of the Voting Rights Act. Certainly Congress knew there would be costs of translation when it enacted section 203. But that is a necessary cost if we truly desire to include all *1064 eligible voters in the electoral process. In amending the Voting Rights Act, Congress was responding to a history of language discrimination in voting. It did not suggest that its remedy should be undermined because there might be an increased financial burden on states or political subdivisions. See 42 U.S.C. § 1973aa-la. Such translation costs are a burden we must bear as members of a diverse, multilingual society.
Further, it is not clear to me that the costs of translation would actually deter groups from circulating their petitions. The statement on a recall petition is subject to a maximum of 200 words. See Cal. Elec.Code § 11020(b). I find it hard to believe that the “expense and trouble” of translating 200 words would be enough to discourage recall proponents. Moreover, states or political subdivisions subject to section 203 are necessarily areas with significant minority language populations and already have systems in place through which other voting materials are translated. I do not believe that a slightly increased financial burden should outweigh the right of every voter to participate in the electoral process, or that this is a sufficient reason to justify leaving limited-English proficient voters in the dark about the petitions they are solicited to sign. In short, I am not swayed by an unseen and unproven chilling effect that a petition translation requirement would cause.
CONCLUSION
“[T]he purpose of the bilingual provisions of the [Voting Rights] Act is to end the language disability of some citizens to full participation in the electoral process; and to this end, the Act requires information relating to the electoral process to be brought to their attention in both English and the minority language.” Zaldivar, 780 F.2d at 833. Holding that these bilingual provisions do not apply to recall petitions denies minority language speakers the right to fully participate in the electoral process by depriving them of the ability to consider the written arguments for and against a particular recall target. Such a result runs counter to the very purpose of Congress in remedying minority language discrimination in voting. Accordingly, I believe that section 203 of the Voting-Rights Act must apply to recall petitions circulated pursuant to California law. I therefore dissent.

. The Court further explained that
Congress knew that some of the States covered by § 4(b) of the Act had resorted to the extraordinaiy stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these Stales might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself.
Id. at 565 n. 30, 62 Cal.Rptr. 26, 431 P.2d 650 (quoting South Carolina v. Katzenbach, 383 U.S. 301, 335, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).

. In Sheffield, the Court explained,
What is perhaps a more compelling argument concerning the original, and subsequent, congressional understanding of the scope of § 5 is that the Attorney General has, since the Act was adopted in 1965, interpreted § 5 as requiring all political units in designated jurisdictions to preclear proposed voting changes. This contemporaneous administrative construction of the Act is persuasive evidence of the original understanding, especially in light of the ex *1059 tensive role the Attorney General played in drafting the statute and explaining its operation to Congress. In recognition of the Attorney General's key role in the formulation of the Act, this Court in the past has given great deference to his interpretations of it.
Sheffield Bd. of Comm’rs, 435 U.S. at 131, 98 S.Ct. 965 (footnotes and citations omitted).

. Defendants argue that these regulations are not a ''requirement” because the same regulations also provide that "[t]he determination of what is required for compliance with section ... 203[ (c) ] is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction.” 28 C.F.R. § 55.2(c). But, Defendants place too much importance on this language. First, nothing in the record suggests that Defendants engaged in any analysis regarding the applicability of section 203 to the recall petition in this case. Second, the language cited by Defendants does not diminish that regulation's minimum requirement that affected jurisdictions are “required to publish in the language of the ... minority group materials distributed to ... the electorate generally ... for example ... petitions.” 28 C.F.R. § 19(a) (emphasis added).

. The majority notes that people who circulate recall petitions have an incentive to “gather as many signatures as they can.” Maj. Op. at 1052. By the same token, however, signature gatherers have an incentive to fraudulently induce individuals to sign a recall petition, for political reasons or because their compensation for circulating the petition is based on the number of signatures gathered. See below, Part IV.

. Defendants argue that the recall petition was not "provided by” the Orange County Elections Department because the recall proponents here drafted the petition's content, with the exception of Lopez’s response. This seems to take too narrow a view of "provided.” Under such a definition, ballots would not have to be translated, as the candidates' names, occupations, and political party affiliations are not drafted by the state, but rather only "ministerially” assembled onto the ballot.